# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

03 DEC 17 PM 2: 18

U.S. DISTRICT COURT
N.D OF ALABAMA

CHRISTIE L. YOUNG,                )
                                  )
    Plaintiff,                )
                                  )
v.                                )          CASE NO.: CV-02-PT-3186-E
                                  )
TYSON FOODS, INC.,                )
                                  )
    Defendant.                )

ENTERED

DEC 17 2003

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Tyson Foods, Inc.'s ("Tyson") Motion for

Summary Judgment, filed on October 20, 2003.

## FACTS[1] AND PROCEDURE

Plaintiff Christie L. Young ("Young") was hired by Tyson in April 1997 as a contract

nurse. *See* Pl. EEOC Charge.  Around November 2000, Young was hired permanently as a

contract nurse at Tyson's Ashland plant. Compl. ¶ 3.  Around August 2001, Young reported to

Tyson incidents of sexual harassment by her manager, David Benson ("Benson").  Compl. ¶ 5.

After Tyson investigated Young's harassment complaint, Benson resigned from Tyson.  Compl.

¶ 6.[2]  Burdick testified that Tyson made the decision to terminate Benson prior to his resignation,

but Benson resigned preemptively.

After Benson resigned, Young alleges, she was subjected to "disparate treatment . . . [and

---

[1] The "facts" are as alleged by plaintiff or as not rebutted by plaintiff.  The court also notes where the
parties disagree about the facts.  The fact and argument sections of this memorandum opinion may overlap
somewhat.

[2] Tyson asserts that Lisa Burdick ("Burdick"), Tyson's Complex Human Resource ("HR") Manager at the
Ashland plant, investigated Young's harassment complaint.



a] hostile work environment consisting of but not limited to offensive remarks, deliberate avoidance, harassment concerning expense reports, unwarranted monitoring, a new attendance policy designed and focused on the Plaintiff, disciplinary write-ups and general hostility." Compl. ¶ 7.[3]  According to Young, the Tyson employees who retaliated against her were Kathy Pinkston ("Pinkston"),[4] Jeff Garner ("Garner")[5], and Chip Mattox ("Mattox").[6]  *See* Pl. Opp. at 1.

In 2001 and 2002, Tyson allowed work release inmates from the local prison to work at Tyson.  Until May 2002, Burdick testified, Tyson contracted with a security service to provide guard service for the Ashland facility when a significant number of inmates worked the third shift.[7]  On September 12, 2001, Young overheard a Muslim work release employee make negative remarks about the September 11, 2001 terrorist attacks.  Plaintiff testified that these remarks upset her so much that she directly called the work release camp and reported the incident to Sergeant Turner, the officer in charge.[8]  According to Pinkston, Sergeant Turner then

---

[3] The complaint consists of one count labeled "Retaliation."  However, the court notes, the complaint also refers to "disparate treatment," "hostile work environment," and "gender discrimination."  For instance, the complaint contains the following allegations: "Defendant discriminated based on gender by retaliating against the Plaintiff for reporting the above-mentioned sexual harassment by a manager"; "The Defendant discriminated against Plaintiff based on gender because males found in violation of similar or more serious violations were not terminated by the Defendant"; and "Plaintiff avers that the termination was in retaliation for filing the sexual harassment report and based on gender discrimination."  Compl., ¶¶ 11, 13-14.

[4] Pinkston was employed in the HR department at Tyson's Heflin, Alabama facility.

[5] Garner was Plant Manager at Tyson's Ashland facility.

[6] Mattox was Shift Manager and Benson's supervisor at Tyson's Ashland facility.

[7] *See* Burdick Decl., ¶ 5.

[8] While Tyson's summary judgment submission refers to a "Sergeant Martin," the cited portions of plaintiff's deposition as well as other documents from the record refer to Sergeant Turner.

2

contacted Pinkston in Tyson's HR department and complained about Young's call.[9]  The
sergeant allegedly wanted to limit the number of Tyson employees who communicated directly
with the prison about inmates.

Before Young's phone call, Tyson had no written or oral policy regarding nurses calling
the work release camp.  After this call, Tyson contends, an oral policy was articulated to all of
the nurses, including plaintiff, prohibiting direct contact with the camp; instead, nurses were
supposed to first contact HR (or management if HR was unavailable) to initiate the call.  Teena
Stewart ("Stewart")[10] and Carol Shears ("Shears")[11] testified to verbally counseled plaintiff about
the September 12, 2001 call and conveying this policy to her.  Prior to counseling plaintiff,
Shears declared, Shears also conveyed the work release camp call-in policy to the second shift
nurse, Pat Denny.  The court notes that Plaintiff testified to not recalling the details of the
September 2001 conference call with Stewart and Shears involving the new work release policy.
Furthermore, Young denies being told that she should coordinate contact with the work release
camp either through HR or senior management.

In October 2001, Young and other nurses from the Ashland facility attended a nursing
seminar in Arkansas.  Prior to attending the seminar, Young requested and received an eight
hundred dollar ($800.00) cash advance for travel expenses.  Upon returning from the seminar,
Young completed an expense report accounting for five hundred eighty-eight dollars and
seventy-five cents ($588.75) of the advance.  This left plaintiff owing Tyson two hundred eleven

---

[9] Prior to September 12, 2001, Young testified, Sergeant Turner personally told her that she could call the
work release camp any time she had a problem.

[10] Stewart was Nurse Manager at Tyson's Ashland and Heflin facilities as well as Young's supervisor.

[11] Shears was Third Shift HR Manager at Tyson's Ashland facility.

3

dollars and twenty-five cents ($211.25).  Stewart approved Young's expense report and sent the

report to the Travel & Expense Department ("T&E") in Springdale, Arkansas.  However, T&E

did not receive the report, according to Darin Hahn ("Hahn"), Manager of Corporate Payment

and Spending at Tyson.[12]  Pursuant to company policy, if an expense report is not received

within ninety days after receipt of a cash advance, the advanced sum is automatically deducted

from an employee's payroll check.  *See* Hahn Decl.

When the T&E department did not receive Young's report within that time period, T&E

began deducting the $800.00 balance from Young's weekly paychecks.[13]  As a result, Young's

January 17, 2002 paycheck, in the net amount of $379.14, was offset entirely by the advance.

On Monday January 21, 2002, Young notified Tyson HR of what had occurred.  According to

Pinkston and Hahn, Pinkston tracked down another copy of plaintiff's expense report and

resubmitted it to T&E to remedy the situation.  However, according to Tyson, by the time Young

raised the issue, the remainder of the $800 advance had already been processed as an offset to

plaintiff's next paycheck.  As a result, Young's January 24, 2002 check in the net amount of

$267.08 was also offset entirely by the advance.  Young informed Pinkston of her second

deficient check.  Pinkston then "made some calls" and requested a vendor check be cut for

Young in the amount of $434.97.[14]  On January 28, 2002, a vendor check was cut in the amount

of $477.87, which exceeded the amount owed to plaintiff.  According to Tyson, Young was

permitted to keep the excess pay to compensate for her trouble.  Thus, Tyson contends, "[A]

---

[12] Young's EEOC charge, Tyson points out, referred to the report as "lost."

[13] Young received a paycheck each Thursday evening.

[14] This amount represented the difference between what had been offset (a total of $646.22) and what was owed ($211.25).

check was cut that (more than) remedied the problems within seven days of Plaintiff first raising the issue."

On January 15, 2002, Tyson implemented a new attendance policy for nurses at both the Ashland and Heflin facilities.[15] Nurse Manager Stewart wrote the policy. Stewart testified that she implemented the policy (which she deems a guideline rather than policy, *see infra*), for reasons wholly unrelated to Young's previous complaint of harassment.[16] All nurses at the Heflin and Ashland facilities, including Young, were required to sign an acknowledgment of their receipt of the new attendance guidelines. Stewart testified that the new guidelines required nurses at the Tyson facilities to call in at least three hours prior to the beginning of their shift if they were going to be absent. Nurses were allowed a fifteen-minute grace period for tardiness, e.g., for a 10:00 p.m. shift, nurses would not be counted tardy until 10:16 p.m. Clocking in past the fifteen-minute grace period resulted in the following progressive discipline: a verbal counseling for the first incident, a warning for the second, a "serious (final written) counseling" for the third, and possible termination for the fourth.[17] Young has not denied being tardy on

---

[15] The events upon which Young's claims are based occurred at Tyson's Ashland plant. Young did not work at the Heflin plant.

[16] Stewart offered the following reasons for implementing the January 16, 2002 attendance policy:

> In January 2002, due to OSHA rules regarding mandatory nursing coverage for certain employers and because of excessive overtime, I implemented a set of attendance guidelines to apply to the nurses at the Ashland and Heflin facilities. The supervisors had expressed concern to me about the amount of overtime that was being paid to nurses who had to work beyond their shifts to cover for late reliefs. I also implemented this policy because I felt it was unfair for nurses to have to stay beyond their shifts to cover for their relief. I announced and distributed copies of the new guidelines to the Ashland facility on January 16, 2002 and to the Heflin facility on January 17, 2002.

Stewart Decl., ¶ 4.

[17] *See* Stewart Decl., ¶ 5.

January 17, 2002, January 31, 2002,[18] February 11, 2002, February 22, 2002, and May 17, 2002. Young was progressively disciplined for these infractions (except for the January 31st incident). According to Stewart, the final infraction would have resulted in Young's termination (as the fourth tardy), but Stewart was on a brief medical leave and did not have a chance to process this tardy before Young was terminated for the Wilbur Sloan ("Sloan") work release incident.[19]

On the May 23, 2002 night shift, Sloan, who was a work release prisoner/Tyson employee, reported to Young that he was going to be working overtime into the day shift in the "live hang" department. He asked Young to contact the work release camp and inform them of this fact (so he would not be expected to return on the prison bus). Young obliged Sloan and directly called the camp to report that Sloan was working overtime. Young did not verify Sloan's story or contact Resources or Tyson management to make the call (as allegedly required by the oral policy). As it turned out, Sloan had not been asked to work overtime, and he escaped from the Tyson premises. On or about May 28, 2002, Tyson terminated Young, allegedly because of the incident involving Sloan. Compl. ¶¶ 8-9. Burdick testified that she was the decision maker regarding Young's termination. In the Separation Notification Form dated May 28, 2002, Tyson listed "Gross Misconduct – Verbal/Written Misrepresentation" as the reason for Young's discharge.

On December 30, 2002, plaintiff filed a complaint alleging retaliation in violation of Title

---

[18] On this occasion, Stewart testified, Young informed Scoggins (a maintenance supervisor) forty minutes after her shift commenced that she was suffering from a migraine. However, Stewart stated, Young did not report the migraine to the HR manager on duty, to the nurse on duty, or to her supervisor, as required by the attendance guidelines. Nonetheless, according to Stewart, Stewart did not count this tardiness against Young, and it did not become part of the progressive discipline structure imposed by the new attendance policy.

[19] Stewart Decl., at ¶ 10.

VII. Compl., Count I (Retaliation).[20]

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F. 3d 1291, 1293 (11th

---

[20] On February 14, 2003, Young amended her complaint to correctly name Tyson Foods, Inc. as defendant. Specific averments in the complaint have been discussed earlier in this memorandum opinion.

Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.   Defendant's Motion

According to Tyson, no genuine issue of material fact exists with regards to plaintiff's retaliation claims.  Tyson references Young's allegations, i.e., (1) poor treatment (including avoidance and "offensive remarks"); (2) offsetting Young's paychecks after an expense report submitted by plaintiff was lost; (3) failure to discipline a male nurse after he allegedly disbursed anti-nausea medication to an employee; (4) implementation of an allegedly selective attendance policy that resulted in write-ups for plaintiff (but not for another female nurse); and (5) plaintiff's termination.

Aside from her termination, Tyson contends, Young has failed to offer substantial evidence that she was subjected to an adverse employment action.  *See Gupta v. Fla. Board of Regents*, 212 F.3d 571 (11th Cir. 2000); *Lucas v. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001).  Furthermore, Tyson argues, Young has failed to demonstrate the requisite causation and pretext.  To the extent that Young failed to file her EEOC charge within 180 days of the alleged retaliatory events, Tyson argues, such claims are time-barred.  Tyson also contends that Young's harassment claim must fail because the events occurring during plaintiff's employment cannot constitute acts of unlawful retaliation under Title VII and do not rise to the requisite level to create a retaliatory hostile environment.

8

## II.    Plaintiff's Opposition/Succinct List

Young alleges that she was terminated as a result of protected activity, i.e., pursuing a sexual harassment complaint against Benson. Young posits that the following evidence shows she was subjected to "harassing and offensive treatment": "(1) management personnel avoidance and offensive comments, (2) delay in pay over a 'routine' expense report, (3) selective discipline of other employees with egregious violations, (4) selective application and enforcement of the attendance policy implemented in January 2002, and (5) termination."[21]

_____

[21] Plaintiff's June 13, 2002 EEOC charge stated:

After [Benson's] resignation, I was subjected to **disparate terms and conditions of employment by having to work in a hostile environment**. **I was being subjected to offensive remarks by some management officials and totally ignored or disregarded as being present with others.** In October 2001, I completed paper work to attend an annual nurses conference. My paperwork was lost. In November 2001, my pay check was being cut more than the advance that I received for the conference and the employer refused to cut me a counter check when this happened. None of the other attendees were subjected to the harassment I received about the advance and some did not complete the paperwork until December 2001. I was monitored more closely than any other employee. In January 2002, the company instituted a time and attendance policy at my plant for the nursing staff. The policy stated if you were late four times in a year you would be discharged. The third shift manager, who was a friend of the sexual harasser, started e-mailing my supervisor on any infractions he felt that I had committed. I was written up on one occasion for being one minute late. My supervisor had originally told me that it was not a problem but came back to me four days later and told me she had been instructed by upper management to write me up and if she didn't she would be written up. Things of this nature went on until my termination. **Other employees were not subjected to this**.

The reason given for the discharge was that I misrepresented the employer by contacting work release for an inmate to work overtime and no one has that authority but a human resource officer, according to Lisa Burdick, Complex HR Manager.

I **believe I have been discriminated against because of my sex, female and in retaliation for having complained of the sexual harassment by my superintendent, in violation of Title VII** . . . . **A male nurse gave an employee some of his personal prescription for controlled substance medication and no action was taken against him. Another male employee took inmates out to lunch and to the mall on several occasions and no action was taken against him. Other employees have called who do not work in human resources for inmates to work over and no action was taken against them.** I believe since I would not resign after all the pressure that had been placed upon me, the alleged policy violation was the only recourse left to get me out of the system. Prior to my discharge there had not been a policy, verbal or written, nor a practice

A.  **General Evidence of Retaliation**

According to Young, her evidence of retaliation is mostly testimonial since "[r]etaliation is, by its basic nature, a secretive series of acts."  Young alleges a friendship between Benson and certain Tyson management personnel, i.e., Pinkston, Mattox, Garner, and Burdick.[22] This friendship, Young argues, motivated Tyson's eventual termination of her and "creates a reasonable inference that the managers retaliated against the plaintiff because the plaintiff's sexual harassment complaint led to David Benson's resignation."  Young further argues that Tyson's articulated reason for her termination, i.e., that she violated company policy by calling a work release camp about Sloan, was not in writing.  Young asserts: "The fact that the defendant claims that calling the work release camp was a violation worthy of termination is contradicted by its failure to document the alleged policy and its undisciplined approach to informing its employees of the alleged policy."

In support of her retaliation claim, Young generally cites the following evidence (all derived from her own testimony): (1) Pinkston's praise of Benson;[23] (2) Mattox's attitude towards Young

---

as to who could contact work release about an inmate working over.  I never had a work
performance problem and all my evaluations had been good prior to the sexual harassment incident.

(Emphasis added by court).

The court notes that plaintiff's opposition brief appears to contain no specific facts relating to a male
employee taking inmates to lunch and to the mall or and other employees calling the work release camp directly.

[22] NOTE: Burdick (who decided to terminate plaintiff) is not listed as a retaliator in plaintiff's deposition
or under the heading "Dates and Individuals Responsible for Actions" in plaintiff's opposition brief.  It is certainly
not unusual for co-employees to be friends.

[23] Regarding Pinkston's comments, plaintiff testified:

I was told at different occasions – by each of them at different times that it caused a lot
of problems for everybody, that people got in trouble, Chip got in trouble.  Kathy said he
was really good guy, and – well, she made statements to me like she was proud I didn't
give in to him, because any of the other girls would have up front because they just thought
he was so cute, things like that.
. . . . [Pinkston] said she knew she was good friends with David, but she could have put
that aside for it.  And she came in there and told me that every morning when she came in

10

after she filed a harassment complaint against Benson;[24] (3) Garner's attitude in ignoring her;[25] (4)

negative treatment regarding her expense report;[26] (5) failure to discipline another female nurse who

---

to work – well, not every morning.

    Plaintiff also testified that Pinkston "defamed" her by telling plaintiff's supervisor, Stewart, "something negative about dating black men."

[24] Plaintiff testified to the change in Mattox's attitude after she filed the harassment claim against Benson: "Well, mostly he [Mattox] just – Where he used to talk a lot, have conversations during the night on third shift, immediately the first night when I returned to work after reporting it, and Lori reported back to work also, he wouldn't even make eye contact with us. He wouldn't speak to us at all." While Tyson asserts that Young testified to an eventual "warming up" between Mattox and Young, the court provides Young's specific testimony on this point:

> Q: Did you ever tell anyone other than Carol Shears and Teena that Chip was ignoring you or that you felt like he was ignoring you?
> A: No, because there was no one else to tell.
> Q: And in response, Carol went and talked to Chip, and Chip came in and shook your hand and, at least, eventually or within a short period of time after that, he warmed up and began conversing with you again; correct?
> A: Yeah. But usually it was trying to make me feel bad for what I did [report Benson], because he had to suffer for it. It would have been easier for him if I had not said anything, because he got into trouble.

Young further testified:

> Q: And you said that after a couple of months, [Mattox] warmed up to you; is that correct?
> A: It was a lot more than a couple of months.
> Q: Okay. Your testimony earlier was that it was a couple of months.
> A: Well, meaning two months, no, it was longer than two months.
> Q: Three?
> A: It was probably maybe around Christmas or January. But warming up is maybe an overstatement, because he wasn't really that warm.
> Q: Well, he stopped ignoring you and started talking to you and having discussions with you?
> A: Somewhat. We never really did have discussions again. When we did talk, he just would bring things up about the trouble it caused with David [Benson] and everything. I felt like he was trying to make me feel bad.

[25] Specifically, plaintiff stated: "He didn't acknowledge my presence at all every again . . .. He just never spoke, period."

[26] Regarding the expense report, plaintiff believed that her refund check for a nurse's conference in Arkansas was delayed for retaliatory reasons. In this vein, her deposition reads:

> Q: Just so I'm clear, the reason you felt your check was delayed was because you talked to Nancy Butts in January of 2002, and she indicated to you she had not completed her expense check or her expense report?
> A: They had begun – They asked me about mine, because they had not received mine, and they began taking my money. And they had not even asked Nancy about it. She never even did one. And that's what she said, she had never even done one. But they didn't bother asking her where hers was, and they didn't take any money out

was late on several occasions, "indicating that plaintiff was singled out";[27] (6) Tyson's failure to

terminate a male nurse for an "egregious violation of Company policy";[28] (7) initiation of an

attendance policy intended to impact her;[29] and (8) plaintiff's testimony that there was no Tyson

_____

of her check . . . .

    *Q: Any other reason that you believe that your delay in getting this money was retaliatory other than what
you heard from Nancy?*
    A: Well, I just felt like things were – they were trying to make things difficult for me at work.

[27] According to Tyson, female nurse Tammy Byron ("Byron"), who allegedly was late on three occasions,
was in fact written up one time by Stewart for being tardy.

[28] According to Young, Roger McVey ("McVey"), while working second shift in early winter 2001, gave
an inmate part of McVey's personal supply of Phenergan, an anti-nausea drug. Plaintiff testified that she saw this
transfer take place and that McVey told Nurse Manager Stewart about it. When asked how this incident relates to
her, Young testified:

    *Q: Did you do something like that as well?*
    A: No.
    *Q: Well, then, how were you treated differently from Roger?*
    A: Because he was not – You can go to prison for that and lose your nurse's license. Most people get
terminated and worse for that. He didn't even get written up for it.

    Plaintiff further stated:

    A: Sergeant Turner was there the next night. I was in there talking to them about one of
    the inmates that was sick, and then when I was leaving out, Kathy and Carol – Kathy
    was there also that night, and she asked me to ask Roger to come in. So I did,
    because it was the beginning of my shift and the end of his. And they asked him –
    Kathy, Carol, and Sergeant Turner asked him if he had given him Phenergan, and
    he said "Yes." And they said, "Okay, well, don't do it again."
    *Q: You weren't in the meeting; right?*
    A: No. Carol told me.

[29] Concerning the attendance policy, plaintiff testified:

    *Q: Who implemented the attendance policy?*
    A: Teena said it came from corporate. If it came from corporate, it would usually go throughout the whole
company, but yet it was just ours, which is another reason I think it was aimed at me, because it was just at the
Heflin and Ashland plant.
    *Q: You didn't work at the Heflin plant?*
    A: No . . .
    *Q: And you don't know if the other plants had an attendance policy for the nurses; correct?*
    A: Yes, I do know, because I asked Teena if the other plants did, and she said it was just for our complex.

policy about calling the work release camp.[30]

**B.    Evidence of Causation**

To support her causation argument, plaintiff alleges the following facts (based on the depositions of Stewart, Mattox, and Scoggins): Tyson's and Stewart's awareness of Young's harassment complaint against Benson;[31] Mattox's position as Benson's immediate supervisor at the time of the harassment complaint; Mattox's testimony that Pinkston investigated the sexual harassment claims against Benson;[32] Mattox's testimony that he did not socialize outside of work with Stewart, Burdick, or Pinkston, compared to Joel Scoggins's testimony that he believed Benson and Mattox went fishing together (but was unsure of the number of times); Mattox's e-mail to Stewart concerning the plaintiff.[33]

**C.    Evidence of Pretext**

In support of pretext, plaintiff alleges the following: Tyson's lack of a written policy about calling the work release camp; Stewart's creation of the Tyson attendance policy implemented on

_____

[30] As mentioned previously, Young denies learning of this policy in the September 2001 conference call (and says she does not remember what was said in the call), although Stewart and Shears testified to counseling Young about the policy in September 2001. *See* Stewart Decl; Shears Decl. Pinkston also confirmed the account of Stewart and Shears. *See* Pinkston Decl. Again, there is no mention of Burdick, the decision maker.

[31] The citation relied upon by plaintiff, defendant notes, references only Stewart's and Burdick's (not other Tyson employees') awareness of Young's harassment complaint.

[32] Tyson argues that Burdick (not Pinkston) did the primary investigation into the harassment complaint and was also the decision-maker for Young's termination.

[33] According to Stewart (who worked off-site), she asked Mattox to notify her when nurses were late. The court provides the text of Mattox's email to Stewart:

> You may want to check Christy's clock in time. I was coming through the front
> hall when I saw her come in the front door . . . It was 10:30 pm on the dot. She
> may have gone out for something, I don't know . . . Just FYI. Chipper

Plaintiff testified that she lacked evidence that this e-mail was somehow linked to her prior harassment claim.

January 15, 2002;[34] Stewart's testimony that Tyson had no policy for calling the work release camp

prior to approximately September 11, 2001; Stewart's testimony that nurses such as Young were not

responsible for monitoring the whereabouts of work release employees; Young's Separation

Notification Form (signed by Pinkston, Stewart, and Burdick) indicating that Young was discharged

for gross misconduct and verbal/written misrepresentation;[35] Tyson's implementation of a new

attendance policy on January 15, 2001, which Tyson required plaintiff to sign;[36] Benson's (the

alleged harasser's) Separation Notification Form (signed by Pinkston, Burdick, and Garner) stating

Benson's resignation for personal reasons, not misconduct.

## III.    Defendant's Response

Young is pursuing only a retaliation claim based upon actions allegedly taken by Tyson after

she filed a harassment complaint against a manager (who subsequently resigned from the company).

The hostile, retaliatory actions alleged by Young, Tyson notes, include (1) subjecting her to

---

[34] Stewart testified that the policy was really a guideline and distinguished policies and guidelines as follows:

   A: A policy is approved at the corporate level I think and pretty much blankets the entire company. And guidelines are something that you utilize to go by to – within your department, you know, to kind of structure them to your need . . . .
   *Q: Was the attendance guideline totally your idea to create?*
   A: It was my solution to a problem. I wanted to fix it and make it better. And I feel like if we had some kind of structure, then we could make it better.

[35] According to plaintiff, Tyson has not shown that Young knowingly made a verbal misrepresentation to the work release camp. Young contends: "A jury could determine that labeling a telephone call to the work release camp as 'gross misconduct - verbal misrepresentation' was a contrived excuse to cover up unlawful retaliation."

   In response, Tyson argues, an employer need not prove that the employee knowingly made the representation. Tyson argues: "Regardless of whether [Young] did so intentionally or as a result of her own gross negligence – she clearly misrepresented the work status of a work release inmate to the Prison Camp, which facilitated the inmate's escape. Her conduct on that occasion (including her failure to verify the inmate's claim that he was working over before reporting this to the Camp) was clearly tantamount to gross misconduct. Plaintiff has presented no evidence to dispute the clear reasons for her discharge."

[36] Facts relevant to the attendance policy and its application to plaintiff have been discussed earlier in this memorandum opinion.

14

"harassing and offensive" treatment during her employment[37] and (2) terminating her in May 2002. Again, Tyson observes, Young has listed Pinkston, Garner, and Mattox as the Tyson individuals who allegedly retaliated against her – not Burdick, the HR manager who made the termination decision. Addressing Young's argument about the managers' friendship with Benson as raising an inference of retaliation, Tyson argues that the record contains insufficient evidence of such friendship. In support of this friendship argument, Tyson contends, plaintiff has only offered (1) the testimony of Scoggins about his belief that Benson fished with Mattox, which Mattox has denied; and (2) plaintiff's own testimony that Pinkston praised Benson as being a good guy after his discharge. Notably, Tyson contends, there is undisputed evidence that after an investigation, Burdick had decided to terminate Benson (based on plaintiff's allegations) prior to Benson's resignation.

Contrary to plaintiff's claims of retaliation, Tyson argues, the undisputed evidence links her termination for "gross misconduct" to her facilitation of the escape of a work release inmate.[38] Tyson contends: "While Plaintiff attributes a great deal of significance to the fact that the proper procedure for contacting the Camp (i.e., through H.R. or Management) was not reduced to a written policy– her failure to follow this procedure was only one part of her overall gross misconduct on that occasion. If Plaintiff had taken any action whatsoever to verify the inmate's claim that he was working another shift, the inmate would not have escaped, and Defendant would have avoided the crisis that followed."

Relying upon *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997), Tyson

_____

[37] Evidence relating to this treatment has been detailed earlier in this memorandum opinion.

[38] This incident has already been discussed in detail.

asserts, plaintiff must establish a *prima facie* case of retaliation for every one of her claims of retaliation and evidence that the legitimate reason given by defendant for terminating plaintiff was merely a pretext. Tyson argues that Young has failed to meet this burden.

### A.   Prima Facie Case of Retaliation

### 1.   Alleged Avoidance and Offensive Comments by Pinkston, Mattox, and Garner

Addressing Young's evidence of retaliation, Tyson calls into question Young's depiction of a circle of friends at Tyson which included Pinkston, Mattox, Garner, Burdick, and Benson (the alleged harasser).[39] Tyson also argues that friendship with the alleged harasser does not constitute evidence of a retaliatory motive.[40] Tyson argues that plaintiff's facilitation (even if unintentional) of inmate Sloan's escape motivated her termination.

Addressing Pinkston's, Mattox's, and Garner's alleged avoidance of plaintiff and offensive comments to her, defendant admits that plaintiff testified as to these incidents (while denying that the events occurred), but Tyson adds the following evidence: Young also testified that Mattox eventually warmed up to plaintiff;[41] Young has not demonstrated that anyone other than Stewart and Burdick were aware of Young's harassment complaint against Benson; Burdick (not Pinkston) conducted Tyson's investigation of Young's harassment complaint; Scoggins only testified that he believed Mattox had fished with Benson, without being able to pinpoint the frequency; and the email from Mattox to Stewart regarding plaintiff's thirty-minute tardiness to work was sent at Stewart's

---

[39] These facts and Tyson's arguments in this regard have already been discussed earlier in this memorandum opinion.

[40] Addressing plaintiff's contention that Pinkston held Benson in high regard, Tyson argues that this is irrelevant since Burdick (who believed plaintiff's harassment allegations and decided to fire Benson) was the Tyson employee who decided to terminate Young. Tyson repeats that Burdick is not listed in plaintiff's opposition brief as one of the individuals who allegedly retaliated against her.

[41] Plaintiff's testimony in this regard has already been discussed.

request, according to both Stewart and Mattox.[42]

Even assuming *arguendo* the accuracy of Young's testimony about Pinkston's, Mattox's, and Garner's behavior or actions, Tyson argues, "these acts are a far cry from actionable retaliation nor do they rise to the level necessary to create a retaliatory hostile environment." To support a Title VII retaliation claim, Tyson argues, the Eleventh Circuit requires the plaintiff to show that the "terms, conditions or privileges" of her job were impacted in an "objectively serious and tangible way." *See Gupta v. Fla. Board of Regents*, 212 F.3d 571, 588 (11th Cir. 2001); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)("An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment.")

Applying this standard, Tyson contends, courts have consistently found that claims about unkind remarks or general hostility from co-workers do not constitute adverse employment actions. *See Manning v. Metro. Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir. 1997)(finding that hostility and personal animus by supervisors did not equate with adverse actions); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271-72 (4th Cir. 2001)(finding that alleged "uncivility of co-workers, most of which constituted refusals to speak" were not adverse employment actions); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)(finding that company officials' "refus[als] to communicate with [plaintiff] concerning her employment-related complaints," "directi[ves] [to] coworkers to ignore her and spy on her," and yelling in a meeting did not constitute adverse employment actions cognizable under Title VII).

Further, Tyson argues, Young has not shown that her harassment complaint against Benson motivated the above-referenced comments/conduct. Although Pinkston and Garner knew of

_____

[42] Again, facts surrounding the email have already been discussed.

Young's harassment complaint against Benson (and Pinkston participated in Burdick's investigation), defendant argues, this knowledge is insufficient by itself to establish a causal connection. *See Hendricks v. Baptist Health Servs.*, 278 F. Supp. 2d 1276 (M.D. Ala. 2003)(section 1981 retaliation)("a plaintiff satisfies the [causal link] element if he provides sufficient evidence that the decision-maker became aware of the protected activity and that there was close temporal proximity between this awareness and the adverse employment action"). Furthermore, defendant argues, Pinkston's involvement in the harassment investigation does not evidence retaliatory motive. Tyson asserts that this is not a situation where Tyson failed to take action against the alleged harasser or disbelieved Young. Finally, Tyson reiterates, neither Scoggins's belief that Mattox fished with Benson nor Mattox's email regarding plaintiff's tardiness establish causation.

### 2.  Alleged Retaliatory Delay in Reimbursement for Expense Report[43]

Addressing the issue of expense report delays, defendant admits that Young testified that she was treated "negatively" with regard to her expense report. However, Tyson contends, such a brief delay (resulting in plaintiff receiving an amount in excess of her entitled reimbursement once the employer became aware of the problem) is not tantamount to an adverse employment action as contemplated by *Gupta*.[44] Tyson argues that a temporary delay or denial of pay is not an adverse action when the pay is subsequently restored. *See Britton v. U.S.*, 133 F.3d 925 (9th Cir. 1997)(affirming summary judgment in a Title VII retaliation case where appellate court concluded that plaintiff suffered no adverse employment action when plaintiff's pay was docked but then restored). Moreover, Tyson argues, Young has failed to connect the loss of plaintiff's expense

---

[43] Facts regarding this delay are discussed earlier in this memorandum opinion.

[44] Despite the inconvenience of two weeks without paychecks, Tyson argues, Young has not presented evidence that this incident resulted in a material change in her employment.

report and Tyson's subsequent docking of her pay to her August 2001 sexual harassment complaint. In fact, Tyson asserts, plaintiff admitted that Stewart mailed the expense report to T&E, that the report was lost in transit, and that Young has no idea whether anyone intentionally lost the report. Finally, Tyson contends, there is no evidence that the T&E employee who authorized the pay offset was aware of Young's harassment charges against Benson. On the contrary, Tyson argues, Hahn (the T&E manager) declared no knowledge of Young's complaint.[45]

### 3.   Alleged Misconduct by Another (Male) Nurse

Turning to the alleged misconduct by Nurse Roger McVey, who gave an inmate his own personal anti-nausea medication and yet was not disciplined, Tyson argues that this incident is unrelated to Young's retaliation claim for the following reasons: the McVey incident had nothing to do with Young; Young was neither accused of similar conduct nor suffered an adverse employment action for similar conduct; and McVey's alleged conduct was not comparable to her own (as necessary to establish McVey as a proper comparator for Title VII purposes).[46]

---

[45] In the Title VII retaliation context, Tyson contends, the decision-maker case must be aware of the alleged protected activity. *See Hudson v. S. Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988); *Durley v. Apac, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000). According to Tyson, plaintiff's testimony that she had a "gut" feeling and "that's what it felt like" is the only evidence linking this incident to her prior sexual harassment complaint.

Additionally, Tyson argues, plaintiff's previous assertions regarding a conversation with nurse Nancy Butts one week before the January 17th paycheck offset do not support her claims. In that conversation, plaintiff alleged, Butts indicated that she had not yet completed her expense report either. Young testified that she did not know whether Butts also suffered a pay offset, if Butts submitted the expense report after their conversation, or if Butts was treated differently than plaintiff in this situation. Hahn testified that Butts's paycheck was not subject to offset because Butts's expense report was submitted and received within 90 days of her advance being issued.

[46] Plaintiff testified to this incident as follows:

*Q: So to the extent he gave an inmate an anti-nausea medication that he shouldn't have, it didn't have any impact on the inmate, and there weren't any consequences; correct?*
A: Not to my knowledge.
*Q: And you're not claiming you did anything like what Roger did? I mean –*
A: Never.
*Q: – the company never accused you of giving medication?*
A: No.

Finally, Tyson contends, plaintiff has not clarified her basis for this claim, linked Tyson's failure to discipline McVey with her complaint against Benson, or presented evidence that Tyson's asserted reasons for not terminating McVey are pretextual.

### 4.    Implementation and Enforcement of Tyson's Attendance Guidelines

Turning to the attendance policy implemented on January 16, 2001, Tyson denies that such implementation constituted a retaliatory action towards Young or was applied to her in a retaliatory manner. However, Tyson contends, the court need not reach the issue because implementation of the neutral attendance policy as well as the verbal/written attendance-related counselings that resulting from Young's violation of the policy were not adverse employment actions.[47] According to Tyson, Young does not dispute her tardiness on the different occasions when she received counselings based on the attendance policy. Further, Tyson notes, Young has conceded that the write-ups at issue did not affect her wages, position at Tyson, or job duties. Relying upon *Graham v. State Farm Mutual Insurance Company*, 193 F.3d 1274, 1284 (11th Cir. 1999)(setting out "threshold of substantiality" for employment actions falling short of termination, demotion, etc.) and *Davis*, 245 F.3d at 1241 (11th Cir. 2001)("[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII when they do not trigger any more tangible form of adverse action . . . ."), Tyson argues, disciplinary counseling or write-ups not coupled with tangible

---

Q: *No inmate ever accused you of that?*
A: No.

Plaintiff further testified that she gained her "understanding" of the actions Tyson management took towards McVey from what was allegedly told to her by Shears and Stewart, not what she personally observed or heard. According to Tyson (based on Stewart's declaration), "the undisputed evidence is that the incident was investigated, McVey denied the allegations, and the results were inconclusive. As a result, no disciplinary action was taken against McVey, however, he was warned that conduct of that nature would result in termination."

[47] At most, Tyson asserts, Young received a "verbal counseling," a memo, a "written counseling," and a "serious counseling" as a result of her admitted tardiness.

employment consequences do not rise to the level of adverse employment actions.[48]

Moreover, Tyson asserts, Young has failed to demonstrate causation between the harassment complaint and these write-ups, as she admitted in her deposition.[49]  As evidence negating causation, Tyson contends, plaintiff received similar write-ups and counseling for tardies <u>long</u> before she ever reported harassment.  Moreover, Tyson asserts, the five-month gap between plaintiff's August 2001 complaint and the first writeup in January 2002 does not support an inference that the events are connected.  *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001)("the three and one-half month period between [plaintiff's] notification to the [defendant] of her son's illness and her subsequent termination does not, standing alone, show that the [defendant's] articulated reasons for her termination were pretextual").[50]

Even if Young could satisfy her prima facie case regarding these verbal counselings and write-ups, Tyson asserts, Young has failed to establish pretext.  Tyson deems plaintiff's evidence, i.e., that Stewart created the attendance policy implemented in January 2001 and then required Young to sign the new policy, insufficient to debunk or rebut the legitimate, non-retaliatory reasons expressed by Stewart for creating the policy.[51]  Defendant further argues: "It is certainly difficult to

---

[48] *See also Douglas v. Caldera*, 2002 WL 187366 (6th Cir. 2002); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).

[49] According to Tyson, the only listed paragraph under the section entitled "Causal Connection" in Young's opposition that may relate to this issue is the paragraph indicating that Stewart was aware of Young's protected activity of filing the August 2001 harassment complaint against Benson.

[50] *See also Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001)("mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close'")(citations omitted).

[51] These facts have been discussed earlier in this memorandum opinion.  Additionally, Tyson relies upon the following testimony by plaintiff: when Young was tardy the second shift nurse would have to stay over (resulting in overtime); OSHA requirements made it critical that nursing coverage be maintained on all shifts; Young agreed that "there is a need for attendance guidelines at every plant" "to give people incentive to be there on time;" and Young stated that there was nothing wrong with Tyson wanting to implement a policy with respect to being at work

believe that if Defendant implemented this policy in an effort to get rid of Plaintiff, that they would include within the policy a very liberal fifteen minute grace period . . . . It is noteworthy that Plaintiff still could not make it to work on time (even with the extra quarter hour built in)."

Tyson reiterates Young's admissions of tardiness. Regarding Tammy Byron's (Young's co-worker's) three noted instances of tardiness, Tyson argues the following: for the first episode, Stewart wrote up Byron; for the second, Stewart had pre-approved Byron's tardiness; and for the third, Stewart told Young that Byron had car trouble and Stewart was "going to let it slide." By plaintiff's own admission, Tyson contends, Tyson also let slide two of plaintiff's tardies, including the July 31st tardy relating to Young's migraine.

Even if Stewart had applied the policy differently to Young (which Tyson denies), Tyson contends that Young has not provided evidence that Stewart's actions manifested an intent to retaliate for Tyson's harassment claim against Benson. Tyson highlights several circumstances that allegedly support the opposite conclusion: (1) Stewart reported Benson's harassment to HR on Young's behalf and encouraged management to terminate Benson; (2) Stewart helped Young by taking her to the hospital when she overdosed on sleeping pills, staying with her overnight, and accompanying her to work when Young felt uncomfortable after the overdose; (3) Stewart frequently calling Young at home in advance of her shift to assist her in getting to work on time; and (4) Stewart acted as a repeated advocate for Young throughout her employment. Tyson also highlights Young's testimony that Stewart (who issued the various write-ups) was not "out to get her."[52]

---

on time.

[52] Specifically, Young testified: "[Stewart] wasn't doing that [the write-ups] to retaliate, no. She had to do it, because that was part of the policy that was implemented."

22

**B.    Alleged Retaliatory Hostile Environment**

To the extent Young claims a retaliatory hostile work environment during her employment, Tyson contends, such claim is meritless.  To support a retaliatory hostile environment claim, Tyson argues, the harassing remarks/conduct must contain the necessary retaliatory connotation or reflect a retaliatory animus.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246-48 (11th Cir. 1999)(in hostile environment sexual harassment context, requiring a showing that actions had sexual or gender-related connotations).  According to Tyson, none of the statements/conduct upon which Young relies has a retaliatory or threatening connotation or content.  Furthermore, Tyson contends, these sporadic, isolated remarks were not severe or pervasive enough to have altered the conditions of plaintiff's employment and created a hostile environment.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).[53]  Tyson concludes: "The events at issue here simply cannot independently or collectively have created an environment that a reasonable employee would consider to be hostile in nature.[54]

**C.    Termination**

According to Tyson, the evidence clearly shows that Young's involvement in Sloan's escape was the legitimate, non-discriminatory reason for her termination.[55]  Significantly, Tyson asserts, Young admitted to telephoning the camp without permission from HR or management and without verifying Sloan's story.  According to Tyson, Young admitted during the termination meeting that she should not have called the camp and should have involved Tyson management or HR in the

---

[53] The court notes that *Oncale* is a same-sex Title VII sexual harassment case.

[54] Near the end of her employment, Tyson notes, Young reported to various doctors that she "enjoy[ed] her job" and that Tyson was supportive.

[55] Facts regarding the Sloan situation have been detailed earlier in this memorandum opinion.

situation.[56] Tyson argues: "It was well within Tyson's discretion and business judgment to terminate her for her gross misconduct on this occasion." Tyson repeats that the "gross misconduct" at issue involved plaintiff's failure to verify Sloan's assertions (which Tyson contends were easily verifiable) plus the phone call.[57]

Tyson highlights the nine-month period between Young's harassment complaint against Benson and her termination.[58]  Additionally, Tyson asserts, Young admitted to accruing a fourth tardy under the January 16, 2002 written attendance policy -- sufficient reason for termination according to the terms of the policy. Stewart testified that the only reason Stewart had not processed Young's final tardy was because Stewart was on medical leave at the time. By the time she returned to work, Stewart testified, the Sloan incident had already occurred. Based upon the foregoing, Tyson asserts: "Certainly, if Defendant was simply trying to get rid of Plaintiff, there was no need to manufacture a reason.  Defendant clearly terminated Plaintiff because they properly felt her conduct *vis a vis* the Sloan incident warranted discharge."

To the extent plaintiff bases pretext upon Benson's resignation without being terminated, Tyson contends the following: Tyson (through Burdick) decided to terminate Benson, but Benson resigned before Tyson could do so; Young has not contended that she tried to resign and was not

---

[56] However, the court notes, Young testified that she did not recall what she said in the termination meeting and specifically did not recall acknowledging a requirement or need to involve management or HR in the Sloan call.

[57] Regarding plaintiff's assertion that guards, not nurses, were responsible for monitoring the inmates whereabouts, Tyson argues: "The fact that Plaintiff was not responsible for the inmate's whereabouts only underscores the inappropriateness of her contacting the Camp to report that the inmate was working over (especially when she did so without even verifying this information)."

[58] Tyson cites *Wascura, see supra, Conner v. Schmick Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)(finding "the four month time lag between [plaintiff's] protected activity and termination, by itself, does not establish a causal connection), and *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)(same finding regarding three-month lag).

permitted to do so; Benson is not a proper comparator;[59] and Young has failed to identify other employees who engaged in gross misconduct which facilitated or assisted in the escape of an inmate, who were not terminated as a result.

## IV.    Plaintiff's Reply

Young did not file a reply brief.

### CONCLUSIONS OF COURT

The court starts with those claims which are patently meritless.

(1) There can be no reasonable inference drawn that the attendance policy established in January 2002 was related to a sexual harassment claim made in August 2001.  The policy applied to all similarly situated employees, not only in Ashland but also in Heflin.  The only way that plaintiff could argue that the policy was directed at her would be to suggest that of the affected employees, she was the one most likely to be tardy.  If that were the case, the purpose of the policy would be to stop the tardiness, not retaliate.  Also see defendant's arguments recounted at pages 20-22, *supra*.  Evidence pertaining to the establishment of the attendance policy would likely not be admissible at trial unless the defendant asserts it as a basis for the termination.

(2) There is no reasonable inference that the expense account matter in late 2001 and early 2002 was deliberate or had any causal relationship with the Benson matter.  Evidence as to this matter would likely not be admissible at trial.

(3) Plaintiff's comparison to the alleged misconduct of Roger McVey is not relevant.  The alleged misconduct of McVey is not similar to that of plaintiff; certainly not "nearly identical."  *See*

---

[59] *See Silvera v. Orange Cty. School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001)("In order to meet the comparability requirement a plaintiff is required to show that [s]he is similarly situated in all relevant aspects to the [comparator]")(emphasis added); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(in determining whether employees are similarly situated, the court must consider whether the employees are involved in or accused of the same or similar misconduct and disciplined in different ways).

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

(4) There is no substantial evidence that plaintiff's termination was motivated by her tardiness as opposed to her having contacted the prison camp concerning a work release inmate. Thus any alleged differential treatment of Byron with regard to tardiness is irrelevant.[60]

After the window dressing is disregarded, the real issue is whether the reason given for plaintiff's termination is pretextual. There is no reasonable inference that Lisa Burdick, the termination decision maker, made her decision in order to retaliate against plaintiff for reporting Benson.[61] Burdick had actively participated in the investigation which led to Benson's resignation. Again, it is not unusual that Benson would have friends at work. There is no question that plaintiff's call to the work release camp facilitated Sloan's escape and created a problem for the defendant. That event occurred on May 23, 2002. The termination came on May 28, 2002. There is no reasonable inference that the termination was related to Benson.

To the extent that plaintiff may be claiming gender discrimination in addition to retaliation, there is even less basis for a reasonable inference of such. The same reasons given above also apply to any such purported claim(s).

The defendant's motion will be granted.[62]

This ⟨ ⟩ of December, 2003.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[60] It appears that the circumstances were different even as to the tardiness.

[61] Even the plaintiff does not so suggest.

[62] The court has not repeated the defendant's arguments which may provide additional reasons.

26